IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MARYLAND**
Southern Division

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 MAY 17  P 12: 14

CLERK'S OFFICE
AT GREENBELT
BY_____DEPUTY

| | |
|---|---|
| SHEET METAL WORKERS' LOCAL UNION NO. 100 WASHINGTON, D.C. AREA PENSION FUND, *et al.*, | * * * |
| Plaintiffs, | * **Case No.: GJH-15-1175** |
| v. | * |
| WESTERN SURETY COMPANY, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

In this action, Plaintiffs, the Sheet Metal Workers' Local Union No. 100 (the "Union"),

Sheet Metal Workers' Local Union No. 100 Washington, D.C. Area Pension Fund, Sheet Metal

Workers' Local Union No. 100 401(k) Fund, Sheet Metal Workers' Local Union No. 100

Washington, D.C. Area Apprenticeship Fund, Sheet Metal Workers' Local Union No. 100

Washington, D.C. Area Vacation Fund, and Sheet Metal Workers' Local Union No. 100

Washington, D.C. Area Health Fund (collectively, "Benefit Funds") seek to recover on a fringe

benefit bond on which Defendant, Western Surety Company ("Western Surety"), is the surety.

Currently pending before the Court is Plaintiffs' Motion for Summary Judgment. ECF No. 30.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md.). For the reasons

that follow, Plaintiffs' Motion is GRANTED, in part, and DENIED, in part.

## I. BACKGROUND[1]

Before it ceased operations, United Sheet Metal, Inc. ("United") was a sheet metal subcontractor that employed members of the Union on various construction projects. ECF No. 32 at 1.[2] In July 2009, the Union and United entered into a collective bargaining agreement ("CBA") in which United agreed to pay set amounts or contributions to the Benefit Funds. ECF No. 30-2 at 37. In a "Washington, D.C. Area Addendum" to the CBA (the "Addendum"), the Union and United agreed to maintain and operate through trustees the various distinct trust funds, which were to be governed in accordance with the Labor-Management Relations Act, 29 U.S.C. §§ 157 *et seq.* and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001 *et seq.*[3] *Id.* The Union and United also agreed to be bound by the terms of the Benefit Funds' respective Restated Agreements and Declarations of Trust ("Trust Agreements"). *Id.* at 37–38. Pursuant to the Trust Agreements, the trustees were authorized to enforce the payment of contributions in the manner in which they deemed proper, and they were not required to compel or enforce payment if, in the opinion of the trustees, any such enforcement would "involve an expense greater to the [Benefit] Fund than the amount to be obtained from any effort to compel or enforce the payment of the [c]ontributions." *Id.* at 73; *see also id.* at 107, 152, 186–87, 235.

Pursuant to the CBA, United was required to make contributions to each fund for "all hours worked" by Union members no later than the 20th day of the month following the month

---

[1] All facts are viewed in the light most favorable to the non-movant.

[2] All pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[3] The CBA indicates that it is applicable in "the District of Columbia, the ENTIRE state of Maryland and the ENTIRE state of Virginia (*with the exception of Buchanan, Dickenson, Lee, Russell, Scott, Smyth, Tazewell, Washington, and Wise Counties, Virginia*), and West Virginia Counties of Berkeley, Grant, Hampshire, Hardy, Jefferson, Mineral and Morgan." ECF No. 30-2 at 15 (emphasis in original). The Addendum, by contrast, is applicable in "[the] District of Columbia; Virginia Counties of Arlington, Clarke, Culpeper, Fairfax, Fauquier, Frederick, Loudoun, Louisa, Page, Prince William, Rappahannock, Rockingham, Shenandoah, Spotsylvania, Stafford, and Warren; Maryland Counties of Calvert, Charles, Montgomery, Prince George's, and Saint Mary's." *Id.* at 35.

during which the work was performed; United was deemed "in default" if it failed to abide by this deadline. *See id.* at 3, 37–39. United was responsible for self-reporting the number of hours worked by each Union member and, accordingly, for calculating the amount of contributions owed in any given month, though the trustees of the Benefit Funds were required to periodically audit United to ensure that hours were being properly reported and all applicable contributions were paid. *Id.* at 23, 39. In accordance with this obligation, each month, United submitted remittance reports to Plaintiffs detailing the number of hours worked and contributions owed. *See id.* at 3.

The CBA also required that United post a bond "to ensure the payment of wages, contributions and deductions . . . ." *Id.* at 39. On September 1, 2011, Western Surety issued a Contractors Fringe Benefits Bond (the "Bond") in the amount of $500,000 naming United as its principal and the Union and Benefit Funds as its obligees. *Id.* at 250–251. The two-page Bond contract provided, in relevant part:

> WHEREAS, the above-named Principal [*i.e.*, United] is employing employees for the purpose of performing sheet metal work in the territory within the jurisdiction of the Union as defined in the collective bargaining agreement now in full force and effect between the Principal and the Union . . . which results in the Principal being obligated to pay wages to the employees, pay dues to the Union and pay contributions to the Funds.
>
> NOW, THEREFORE, the conditions of this Bond are such that if the Principal timely pays the amounts due [to] the [Benefit] Funds, the Union and the Employees under the terms of the collective bargaining agreement, any successor thereto, and any other agreement, then the obligation under this Bond shall be void; otherwise the same shall remain in force and effect. It is expressly understood and agreed that the Surety shall become obligated under this Bond to pay such wages, dues, and contributions as are due and unpaid by the Principal. The Surety further agrees to pay any liquidated damages in the amount of 20% of the delinquent contributions, interest on the delinquent contributions at the rate of 1% per month from date due to date paid, and all attorneys' fees and costs incurred by the Union and the [Benefit] Funds in collecting such amounts as are due.

*Id.* The Bond further provided that Western Surety agreed to pay the Union and Benefit Funds "promptly after receipt of a notice from the Union or the [Benefit] Funds to the Surety of the delinquency in payment of wages, dues or contributions by [United]." *Id.* at 251. Finally, the Bond allowed Western Surety to cancel it by providing 90 days written notice to Plaintiffs and United. *Id.*

On October 4, 2010,[4] United and Western Surety entered a General Agreement of Indemnity ("Indemnity Agreement"), in which United agreed to indemnify Western Surety "against every claim, demand, liability, cost, charge, suit, judgment and expense which [Western Surety] may pay or incur in consequence of having executed . . . [the Bond] . . . . " ECF No. 30-3 at 20. Under the Indemnity Agreement, in the event of a default by United, Western Surety was entitled to all of United's rights under various bonded agreements, all proceeds from bonded contracts, and an assignment of United's "machinery, plant, equipment, tools and materials . . . ." *Id.* at 21. Additionally, United was required to provide Western Surety with free access to its books and records, and was required to submit to a credit report at the time the Indemnity Agreement was entered, as well as "in any review or renewal, at the time of any potential or actual claim, or for any other legitimate purpose as determined by [Western Surety] in its reasonable discretion." *Id.*

Around October or November of 2013, United fell behind in contributions owed to the Union and Benefit Funds. The Union sent a letter to United on December 5, 2013 notifying United that it owed contributions for work performed in September and October of 2013. ECF No. 30-2 at 253–54, 258. In response, United indicated that it was having difficulty obtaining payment from certain customers and it requested a payment plan to make up for the

---

[4] Neither Plaintiffs nor Western Surety indicate how it came to be that Western Surety and United entered the Indemnity Agreement before the Bond was executed in this case, but no party disputes that the Indemnity Agreement applies with respect to the Bond. *See, e.g.*, ECF No. 31 at 36; ECF No. 32 at 1.

delinquencies. *See id.* at 256–57. On December 6, 2013, Plaintiffs and United entered a settlement agreement in which they acknowledged that United was behind on payments for September and October and that it appeared unlikely that United would be able to timely submit contributions for November 2013. *Id.* at 262. Pursuant to the settlement, United agreed to make weekly payments of $100,000 to pay all amounts due for the periods up to and including the work month of November 2013. *Id.* In consideration of the settlement agreement, Plaintiffs agreed to forebear from filing suit or pursing a claim under the Western Surety Bond or filing any bond claims with mechanical or other contractors for that time period. *Id.* at 263.

On January 20, 2014, United requested that certain contributions owed for work performed in December 2013 be added to the amounts owed under the settlement payment plan, and Plaintiffs agreed to do so. *See id.* at 265. And on February 20, 2014, United requested that certain contributions owed for work performed in January 2014 also be added to the payment plan, and Plaintiffs again agreed. *See id.* at 267. At no point between October 2013 and February 2014 was Western Surety provided notice of United's delay in submitting contributions during those months, or of the payment plan entered between Plaintiffs and United. ECF No. 32 at 2.

United continued to submit weekly payments of $100,000 to Plaintiffs through March 6, 2014. ECF No. 30-2 at 6. Then, on March 13, 2014, the Union received notice that United had ceased operations and laid off its employees. *Id.*; *see also id.* at 270. As of that date, United had submitted weekly payments sufficient to pay Plaintiffs for all amounts owed through December 2013, as well as part of the contributions owed for January 2014. *Id.* at 6.

On March 20, 2014, Plaintiffs sent a letter to Western Surety notifying it that United had ceased operations on March 12, 2014 and that Plaintiffs sought to recover under the Bond. *Id.* at 270. The letter indicated that the amount due for January 2014 was $314,138.32, but that United

had a credit of $92,262.66 that was applied to that amount, leaving a balance of $221,875.66. *Id.* at 269. The letter further noted that interest was due on any January contributions paid late, which would be calculated once all January contributions were received by Plaintiffs, and that Plaintiffs would separately request attorneys' fees and costs. *Id.* at 269–70. Finally, the letter indicated that United would still owe contributions for work completed in February and March 2014, and that if Plaintiffs did not receive the amounts owed when they became due, Plaintiffs would amend their bond claim to include those sums, interest, and additional attorneys' fees and costs. *Id.* at 270. Attached to the letter were the reports submitted by United to Plaintiffs documenting the hours worked and contributions owed for the month of January 2014. *Id.* at 271–342.

On March 21, 2014, Plaintiffs sent another letter to Western Surety notifying it that United failed to pay contributions owed for work completed in February 2014, which totaled $332,162.96. *Id.* at 345–46. And on June 24, 2014, Plaintiffs informed Western Surety that United failed to pay contributions owed for work completed in March 2014, which totaled $117,162.63. *Id.* at 413–14. Attached to both the March 21 and June 24 letters were the reports that United submitted to Plaintiffs documenting the hours worked by Union members during the months of February and March 2014 and the total contributions owed for those months. *Id.* at 347–410, 415–43. In all, the amount claimed on the Bond totaled $671,201.25, plus interest, late fees, attorneys' fees and costs. *Id.* at 413. After receiving notice of these claims under the Bond, in July 2014, Western Surety registered its Indemnity Agreement with United as a security interest with the Maryland Department of Assessments and Taxation and the Florida Secured Transaction Registry. *See* ECF No. 30-3 at 29–60.

Between January and March 2014, United served as a subcontractor on at least twelve different construction projects.[5] *See* ECF No. 30-2 at 519. Plaintiffs indicated in the June 24 letter that they had filed claims for payment on project-specific bonds securing work performed by United on multiple projects. *Id.* at 414. As of that date, however, Plaintiffs had not received payment on any of those bond claims. *Id.*

Western Surety initially responded to Plaintiffs claims by seeking further documentation to aid its investigation of the Bond claim, such as copies of the CBA and documentation setting forth the contribution rates. *Id.* at 445–46. Plaintiffs supplied the requested documentation on April 7, 2014. *Id.* at 448–96. On July 31, 2014, Western Surety sought additional information from Plaintiffs, specifically:

> (1) the projects on which the fringe benefit contributions are attributable, (2) the amounts of the claims on a project-by-project basis, (3) those parties in the contractual chain (*e.g.*, the owners, general contractors and subcontractors in the tiers above United . . . ) for each project, (4) whether there are any contract, subcontract or sub subcontract payment bonds, (5) whether United . . . furnished a contractor's license bond and (6) the identity of any sureties.

*Id.* at 498. Plaintiffs responded with certain requested information on or around August 8, 2014. *Id.* at 501. They provided documentation of the hours worked by Union members on five projects during the relevant time period between January and March 2014. *See id.* at 503–09, 540–66. Plaintiffs indicated that they had filed bond claims for funds owed on four different jobs: $72,115.46 for work completed by Union members at St. Charles High School, $4,063.44 for work completed at Hyattsville Elementary, $42,273.08 for work completed at Rockville Judicial Center Annex, and $63,304.16 for work completed at Coppin State University. *Id.* at 501. Plaintiffs also provided copies of the bonds for three of those projects, but indicated that,

---

[5] In pursuing their bond claim against Western Surety, Plaintiffs provided a list of twelve projects on which Union members worked during the relevant time period. ECF No. 30-2 at 519. In a declaration in support of the Motion, however, John R. Shields, the business manager for the Union, referenced a thirteenth project, but he indicated that Plaintiffs have already fully recovered the contributions owed for that project. *Id.* at 7.

despite their efforts, they were unable to obtain a copy of the bond for the Coppin State University project.[6] *Id.*; *see also id.* at 510–17, 520–24, 525–31. Project-specific bonds existed for an additional five projects on which Union members worked, but Plaintiffs did not submit claims on those bonds. *See* ECF No. 31-2; ECF No. 31-8; ECF No. 31-11; ECF No. 31-13; ECF No. 31-14; ECF No. 32-1 at 4–5. As of the filing of the present Motion, however, Plaintiffs have fully recovered the contributions owed for hours worked on three projects, and have filed a lawsuit to enforce a bond covering a fourth project. ECF No. 30-2 at 7–8.

After Western Surety refused to remit any payment on Plaintiffs' bond claim, Plaintiffs initiated the present action in the Circuit Court for Prince George's County, Maryland. *See* ECF No. 2. Western Surety removed the action to this Court on the basis of diversity jurisdiction on April 24, 2015. *See* ECF No. 1; *see also* 28 U.S.C. § 1332; 28 U.S.C. 1441. Western Surety answered Plaintiffs' Complaint on May 1, 2015, and Plaintiff filed the pending Motion for Summary Judgment on October 19, 2015. ECF Nos. 16 & 40.

## II.     STANDARD OF REVIEW

"Under [Federal Rule of Civil Procedure] 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving

---

[6] Plaintiffs' claim under the Coppin State University bond was time-barred, and, accordingly, they did not recover anything on that bond for contributions owed for work completed on that project. *See* ECF No. 31-7.

party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477

U.S. at 322–23. Importantly, at the summary judgment stage, it is not the Court's function to

weigh the evidence but simply to decide if there is a genuine issue for trial. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). A "genuine" dispute of material fact is

one where the conflicting evidence creates "fair doubt," *Cox v. Cnty. Of Prince William*, 249

F.3d 295, 299 (4th Cir. 2001), such that "a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Nevertheless, a

"mere scintilla of proof" is not enough to defeat a motion for summary judgment. *Peters v.*

*Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 252). To defeat the

motion, the party opposing summary judgment must submit evidentiary materials showing facts

on the basis of which the finder of fact could reasonably decide the case in its favor. *Anderson*,

477 U.S. at 252. If a party fails to make a showing sufficient to establish the existence of an

essential element on which that party will bear the burden of proof at trial, summary judgment is

proper. *Id.*

## III.    DISCUSSION

A surety bond is a "tripartite agreement among a principal obligor, his obligee, and a

surety." *Nat'l Union Fire Ins. Co. of Pittsburgh v. David A. Bramble, Inc.*, 879 A.2d 101, 107

(Md. 2005) (citations omitted). "It is a three party arrangement intended to provide personal

security for the payment of a debt or performance of an obligation." *Id.* (internal quotation marks

and citations omitted). A surety, in other words, is "[a] person who binds himself for the

payment of a sum of money, or for the performance of something else, for another." *Id.* "The

liability of a surety is coextensive with that of the principal," and thus, "the liability of the surety is measured by the contract of the principal." *Gen. Builders Supply Co. v. MacArthur*, 179 A.2d 868, 871–72 (Md. 1962) (citation omitted); *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 468 (Md. 2004) ("The liability of a surety is coextensive with that of the principal. The surety is primarily or jointly liable with the principal and, therefore, is immediately responsible if the principal fails to perform." (citations omitted)).

By way of background, suretyship originated in early Rome and England and traditionally took the form of an uncompensated personal guarantee. *See Nat'l Union Fire Ins.*, 879 A.2d at 107 ("A personal surety was not compensated and was motivated by duty rather than profit."). Such personal sureties were ordinarily "favored by the law," but with the emergence of the compensated corporate surety as a business entity, the law developed such that "a surety 'whose obligation is deliberately entered into, as a commercial transaction, and with the exclusive view to the pecuniary profit resulting from it,'" *id.* at 108 (quoting *Smith v. Turner*, 61 A. 334, 336 (Md. 1905)), would not receive such favorable treatment. *See A/C Elec. Co. v. Aetna Ins. Co.*, 247 A.2d 708, 711 (Md. 1968) ("The doctrine that a surety is a favorite of the law, and that a claim against him is strictissimi juris[7] does not apply where the bond or undertaking is executed upon a consideration by a corporation organized to make such bonds or undertakings for profit." (internal quotation marks and citation omitted)). Rather, because "a compensated surety is in effect an insurer, . . . its contract will be construed as an insurance contract most strongly in favor of the party or parties protected thereby," and therefore "forfeiture on technical grounds [is] not . . . favored." *Id.* (quoting *A/C Electric*, 247 A.2d at 711–12). In general, however, ordinary principles of contract interpretation apply when interpreting surety bonds. *See*

---

[7] Strictissimi juris is a Latin term of art meaning "to be interpreted in the strictest manner." Strictissimi juris, *Black's Law Dictionary* (10th Ed. 2014).

*Atl. Contracting*, 844 A.2d at 468 ("A surety bond is a contract and is to be construed as such." (internal quotation marks and citation omitted)).

Under Maryland law, which the Parties agree controls in this case, ECF No. 30-1 at 13; ECF No. 31 at 23, courts follow the objective law of contract interpretation and construction. A court construing an agreement under the objective theory "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated," *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 653 (Md. 2001) (citation omitted), and, to the extent possible, "provisions of a contract are to be interpreted . . . so as to give effect to all." *Nat'l Union Fire Ins.*, 879 A.2d at 110. The "cardinal rule in the interpretation of bonds, as in the interpretation of all written contracts, is to ascertain the intention of the parties and to give effect to that intention . . . ." *Levy to Use of Walbrook Mill & Lumber Co. v. Glens Falls Indem. Co.*, 123 A.2d 348, 352 (Md. 1956). But "when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Taylor*, 776 A.2d at 653. Under this view, "the clear and unambiguous language of an agreement will not give [ ]way to what the parties thought that the agreement meant or intended to mean." *Id.* Thus, on a motion for summary judgment, "a court will only consider extrinsic evidence concerning the parties' intent if it first deems the contract's language ambiguous." *United States v. Hartford Accident & Indem. Co.*, --- F. Supp. 3d. ---, No. JKB-14-2148, 2016 WL 852730, at *6 (D. Md. Mar. 4, 2016) (citing *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 277 n. 12 (Md. 2014)).

In this case, the language of the Bond is straightforward and unambiguous. It provides that Western Surety would be liable to Plaintiffs for "wages, dues, and contributions as are due and unpaid by [United]" and that such payment would be remitted "promptly after receipt of a

notice from the Union or the [Benefit] Funds to the Surety of the delinquency in payment of wages, dues or contributions by [United]." ECF No. 30-2 at 251. Moreover, the Bond provided that, if United failed to pay the amounts due to Plaintiffs, Western Surety agreed to pay "liquidated damages in the amount of 20% of the delinquent contributions, interest on the delinquent contributions at the rate of 1% per month from date due to date paid, and all attorneys' fees and costs incurred by the Union and the [Benefit] Funds in collecting such amounts as are due." *Id.* The evidence establishes that United ceased operating in March 2014, that it failed to submit contributions for the months of January through March 2014, that Plaintiffs notified Western Surety of their claim under the Bond on March 20, 2014, and that Western Surety has not yet paid any amounts owed under the Bond. *See* ECF No. 30-2 at 6, 269–70. Thus, unless the Bond was voided in some fashion, Western Surety's liability under it is clear.

Western Surety, however, contests liability in several respects. Specifically, it argues that: (1) Plaintiffs breached a duty owed to Western Surety by failing to pursue project-specific contract payment bonds before seeking recovery under the Bond; (2) Western Surety was relieved from liability under the Bond because Plaintiffs failed to provide notice of United's financial difficulties; and (3) Western Surety was relieved from liability when Plaintiffs agreed to enter a payment plan with United and thereby modified the CBA. Finally, Western Surety contends that, even if Plaintiffs have established liability on the Bond, they have failed to carry their burden of proof as to the amount of damages owed. In this regard, Western Surety argues that the remittance reports submitted in support of Plaintiffs' Motion constitute inadmissible

hearsay and, in any event, fail to establish the amount of damages owed.[8] The Court will consider each of these arguments in turn.

### A. Cosuretyship Issues

First, Western Surety argues that it has been released from liability under the Bond because Plaintiffs breached their duty to pursue or exhaust any project-specific contract bonds that may have been available to them upon United's default. According to Western Surety, because certain construction projects on which Union members worked during the relevant time period were covered by payment bonds relevant to those particular projects, Plaintiffs had an obligation to pursue recovery under those project-specific bonds before seeking recovery from Western Surety. *See* ECF No. 31 at 29–31, 39.

Although it does not appear that any Maryland court has explicitly defined under what circumstances a cosurety relationship exists, a case on which Western Surety relies in support of its motion explains:

> The test of cosuretyship is a common liability for the same debt or burden. This liability may arise at the same time or at different times, out of the same writing or out of many writings. A common interest and a common burden alone are required to create the relation, and to enable the cosurety who has paid more than his due proportion to claim contribution from those who have paid less than their just proportion of the common liability.

*U.S. Fid. & Guar. Co. v. Naylor*, 237 F. 314, 316 (8th Cir. 1916); *see also Arkansas v. Pufahl*, 52 F.2d 116, 120 (8th Cir. 1931) ("Sureties who are bound for a common principal to insure the performance of the same duty or obligation are cosureties, but not if the obligations are different, as where they are bound for different portions of the same debt." (citations omitted)); *Gen. Mills, Inc. v. Wallner*, 628 F. Supp. 1573, 1575 (D. Minn. 1986) ("If the guaranties are of separate obligations, although arising out of the same transaction, the guarantors are not co-sureties and

---

[8] The Court has reordered the arguments presented in Western Surety's brief and, in some circumstances, combined certain arguments that the Court deems duplicative.

have no right to contribution. Obligations are separate where the guarantors are bound for different portions of the same debt."). The Maryland Law Encyclopedia similarly defines cosuretyship as "the relationship between two or more sureties who are bound to answer for the same duty of the principal and who, as between themselves, should share the loss caused by the default of the principal." Kimberly C. Simmons, *Maryland Law Encyclopedia: Sureties*, § 42 (Mar. 2016) (footnote omitted).

When cosureties share a common liability, each surety is "liable only for their proportion of the debt," *Smith v. State, to Use of Baltimore Cty. Comm'rs*, 46 Md. 617, 619 (1877), and may seek contribution from a cosurety when one pays more than their share of the debt. The right of contribution does not exist, however, "unless [the surety] ha[s] paid an amount exceeding this proportion." *Id.*; *see also Nally v. Long*, 56 Md. 567, 572 (1881) ("[T]he equitable obligation, which binds one surety to contribute to another, springs up at the time the relation is entered into, and is consummated when the surety has paid the debt." (internal quotation marks and citation omitted)); *Simmons, supra*, § 44 ("The right to contribution arises between sureties only when one has paid or satisfied more than his or her proportionate share of the principal obligation."). Moreover, "[a] creditor whose debtor has defaulted may proceed against any of the debtor's sureties or guarantors to collect the outstanding indebtedness; he is not required, according to the general rule, to attempt to collect his debt piecemeal from each of the various cosureties or coguarantors." Roland F. Chase, *Right of guarantor or surety, in order to avoid paying amount in excess of his proportionate share, to compel coguarantors or cosureties to pay their share to creditor*, 38 A.L.R.3d 680 § 2[a] (1971).

Here, none of the project-specific bonds that Western Surety contends preclude Plaintiffs' recovery list United as the principal. *See* ECF No. 31-2; ECF No. 31-4; ECF No. 31-8; ECF No.

14

31-11; ECF No. 31-13; ECF No. 31-14. It is unlikely, therefore, that Maryland courts would deem any of the sureties on those bonds to be cosureties with Western Surety. But even if they were deemed to be cosureties, as the foregoing authorities demonstrate, the only benefit this would provide to Western Surety would be to allow it to seek contribution from those cosureties in the event Western Surety pays more than its proportionate share of its liability to Plaintiffs. Accordingly, the existence of other bonds covering specific construction contracts does not impact Western Surety's liability on the Bond at issue in this case.

### B. Notice of Default

Western Surety next contends that it should be relieved of liability under the Bond because Plaintiffs failed to notify it when United initially experienced financial difficulties and requested a payment plan. ECF No. 31 at 35–36. In support of this argument, Western Surety principally relies on *Hunt Construction Group, Inc. v. National Wrecking Corp.*, 542 F. Supp. 2d 87 (D.D.C. 2008), *aff'd on other grounds*, 587 F.3d 1119 (D.C. Cir. 2009). In that case, the bond at issue secured performance on a construction subcontract. The subcontractor (which was the principal under the performance bond), National Wrecking Corporation ("National"), was to provide excavation services on the project, but caused significant delays in the overall construction. Hunt Construction Group ("Hunt"), the oblige on the relevant performance bond, delayed notifying the sureties of National's delay on the project until several months after National completed work on the project and was no longer on the site. *Id.* at 88–89. Language in the bond provided that, upon National's default and Hunt's notice to the sureties thereof, the sureties could "promptly remedy the default . . . ," or "arrange for the performance of [National's] obligation under the subcontract . . . ," and that "[t]he balance of the subcontract price . . . shall be credited against the reasonable costs of completing performance of the

subcontract . . . ." *Id.* at 91. The court thus concluded that Hunt's failure to timely notify the sureties of National's delays rendered the bond null and void, insofar as that failure prevented the sureties from exercising their options under the performance bond. *Id.* at 96. In other words, under the terms of the relevant bond, "[a]s soon as Hunt knew that [National] would not complete the job on time, it had an obligation to decide whether to declare [National] in default and notify the Sureties (who might have done something to aid [National] in speeding up the work, whether by hiring more trucks, more workers, more oversight, or whatever, in its judgment, would assist the obligor)," but that Hunt could not wait several months until after National significantly delayed the project and had completed the necessary work before providing the sureties with notice of default.[9] *Id.* at 95.

Here, however, there was no provision in the Bond that would have triggered an opportunity for Western Surety to cure any default by United. Although Western Surety was free to cancel the Bond at any point by providing Plaintiffs and United with notice of such cancellation, ECF No. 30-2 at 251, that provision did not create any obligation for Plaintiffs to provide Western Surety with notice of any particular event to allow Western Surety to exercise that option. As previously explained, a bond contract is interpreted as any other contract. *See Atl. Contracting*, 844 A.2d at 468. Because there was no language in the contract requiring Plaintiffs to provide Western Surety with notice of United's financial difficulties, Plaintiffs did not breach any obligation under the Bond in this regard.[10] *See Cnty. of Brunswick v. Lexon Ins. Co.*, 425

---

[9] On appeal, the United States Court of Appeals for the District of Columbia Circuit concluded that timely notice was a condition precedent to the sureties' performance under the bond, and that Hunt's failure to provide timely notice "depriv[ed] them of any realistic opportunity to exercise their rights under the bond to cure the subcontractor's defective performance." *Hunt Const. Grp., Inc. v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1119 (D.C. Cir. 2009).

[10] Even if the failure to earlier declare United in default under the CBA constituted a breach of some obligation owed by Plaintiffs, Western Surety would have the burden to prove that it suffered some harm by such failure, *see*

Fed. App'x. 190, 192 (4th Cir. 2011) (noting that because contractual terms of the bond control, where contract did not require obligee to make declaration of default, there was no legal obligation to do so).

## C. Effect of Plaintiffs' and United's Settlement Agreement

Western Surety next challenges Plaintiffs' decision to enter a settlement and payment plan with United in December 2013 after United had fallen behind in contributions. ECF No. 31 at 36–39. Western Surety argues that this agreement materially modified the underlying contract, relieving Western Surety of liability under the Bond. *Id.* at 38–39. Plaintiffs disagree, and note that, pursuant to the terms of the CBA and the relevant Trust Agreements, Plaintiffs were free to pursue contributions in any way that would be most beneficial to them. *See* ECF No. 33 at 25–27.

The Court of Appeals of Maryland acknowledged in *Wiegand v. State*, 768 A.2d 43 (Md. 2001) that "a change in the agreement by the principal and the obligee, without notice or consent by the surety, *when it materially changes the risk*, entitles the surety to discharge . . . ." *Id.* at 49 (emphasis added). This principle is consistent with the Restatement, which provides:

> If the principal obligor and the obligee agree to a modification, other than an extension of time or a complete or partial release, of the principal obligor's duties pursuant to the underlying obligation . . . the [surety] is discharged from any unperformed duties . . . : (i) if the modification creates a substituted contract or imposes risks on the [surety] fundamentally different from those imposed pursuant to the transaction prior to modification; (ii) in other cases, to the extent that the modification would otherwise cause the [surety] a loss . . . .

Restatement (Third) of Suretyship & Guaranty § 41 (1996) ("Restatement"). When an obligee merely grants the principal an extension of time, however, a compensated surety is not discharged. Rather, under those circumstances, the surety's obligation is only lessened to the

---

*Blackhawk Heating & Plumbing Co. v. Seaboard Sur. Co.*, 534 F. Supp. 309, 316–18 (N.D. Ill. 1982), which, as the Court will explain further, Western Surety has failed to do.

extent of its harm. *See Cadle Co. v. Arborwood II Nominee Corp.*, 757 A.2d 791, 794 (Md.

2000) ("[A] compensated surety . . . [is] not discharged as a matter of law [where creditor

granted extension of time to principal without surety's consent], but would have to prove that it

had been prejudiced by the time extension and, if it could so prove, would have its obligation

lessened to the extent of its harm." (citing *A/C Elec.*, 247 A.2d at 712); Restatement, *supra*, § 40

("If the obligee grants the principal obligor an extension of the time for performance of its duties

pursuant to the underlying obligation . . . [the surety] is discharged from those duties to the

extent that the extension would otherwise cause the [surety] a loss . . . "). Moreover, the burden

of proof rests on the surety to prove any such harm. *New Amsterdam Cas. Co. v. U.S. Shipping

Bd. Emergency Fleet Corp.*, 16 F.2d 847, 852 (4th Cir. 1927).

Notably, in *A/C Electric Co. v. Aetna Insurance Co.*, after the principal initially defaulted

on a payment when its check was not honored by the bank, the obligee accepted a note from the

principal, which, in effect, extended the deadline for payment to the obligee by 60 days and

provided for 6 percent interest during that time. 247 A.2d at 709. The surety in that case sought

to avoid liability, arguing that the acceptance of an extension of time for payment, without the

surety's consent, "substituted a wholly new obligation for the debt." *Id.* at 710. The Maryland

Court of Appeals disagreed and held that, in the case of a compensated surety, an extension of

time does not relieve the surety of liability, but only lessens the surety's obligation by the extent

it was harmed. *Id.* at 713; *see also John T. Callahan & Sons, Inc. v. Dykeman Elec. Co.*, 266 F.

Supp. 2d 208, 238 (D. Mass. 2003) (holding that obligee's "delay in declaring a default, even if it

prejudiced [surety's] ability to obtain reimbursement from the principal obligors under [a]

general indemnity agreement, does not discharge [surety] from its obligations under the

performance bond").

Additionally, in *Board of Trustees, Roofers Local No. 30 Combined Welfare Fund v. International Fidelity Insurance Co.*, the United States District Court for the Eastern District of Pennsylvania faced a similar dispute as the one at issue in the present case. *See* 63 F. Supp. 3d 459 (E.D. Pa. 2014), *aff'd*, No. 15-1367, 2016 WL 1027716 (3d Cir. Mar. 15, 2016). The plaintiffs in that case, trust funds established in Pennsylvania under collective bargaining agreements between a roofer's union and two companies, sought to recover fringe benefit contributions on surety bonds when the companies failed to pay as was required in their collective bargaining agreements. *Id.* at 462–64. The plaintiffs had previously filed lawsuits against the companies when they fell behind in contributions, and the lawsuits ended in settlement whereby the companies agreed to pay the amounts owed in monthly installments, in addition to regular contributions already required under the collective bargaining agreements. *Id.* at 463. Seeking to avoid liability, the surety raised two principle arguments: (1) that the plaintiffs unreasonably delayed giving notice of the companies' default because default occurred when the plaintiffs initiated litigation against the companies, and (2) that the settlement agreements produced by the prior litigation materially modified the underlying contract, and therefore discharged the surety's liability. *Id.* at 467, 470. The court rejected both arguments. Applying Pennsylvania law, which, like Maryland law, requires that surety bonds be interpreted under ordinary principles of contract interpretation, *id.* at 465, the court found that the bond granted the plaintiffs discretion to determine when a "default" occurred under the collective bargaining agreements, and that the settlement agreements did not modify the bonded obligation. The court noted that a material modification which discharges a surety from its obligation "is one that is a *significant change* in the principal debtor's obligation to the creditor that in essence *substitutes an agreement substantially different* from the original agreement on which the surety accepted

liability." *Id.* at 469 (emphasis added) (internal quotation marks and citation omitted). The

settlement agreements did not amount to a "significant change," the court found, because both

before and after the settlement agreements, the bonded obligations—*i.e.*, the collective

bargaining agreements—required the companies to pay fringe benefit contributions, liquidated

damages, fees and costs. Thus, "[t]he settlement sums were for amounts then owed under the

[collective bargaining agreements]—the bonded obligation—and nothing more." *Id.* at 470.

  In this case, the extensions of time Plaintiffs granted to United through the payment plan

are no different than that which was granted to the principal in *A/C Electric Co.* and is

remarkably similar to the issue presented in *Board of Trustees, Roofers Local No. 30*. Although

Western Surety essentially contends that the payment plan "impose[d] risks on [it] fundamentally

different from those imposed pursuant to the transaction prior to modification," Restatement,

*supra*, § 41, the payment plan did not modify Western Surety's obligations under the Bond in

any way. Both before and after the payment plan was entered, Western Surety's only obligation

under the Bond was to remit payments, if and when United failed to do so, for contributions

owed "under the terms of the collective bargaining agreement, any successor thereto, and any

other agreement." ECF No. 30-2 at 250. The settlement agreement entered between Plaintiffs and

United constitutes an "other agreement" pursuant to which United was obligated to remit

contributions, and, under the terms of the Bond, Western Surety was equally liable. Notably,

under the terms of the CBA, United—and, through the terms of the Bond, Western Surety by

extension—agreed to be bound by the terms of the Trust Agreements, which permitted the

trustees to enforce the payment of contributions "in any manner in which [they] may deem

proper," and to forego enforcement of contributions if doing so would "involve an expense

greater to the [Benefit] Fund than the amount to be obtained from any effort to compel or enforce

the payment of the [c]ontributions." ECF No. 30-2 at 73; *see also id.* at 107, 152, 186–87, 235; *Gen. Builders Supply*, 179 A.2d at 872 ("[T]he liability of the surety is measured by the contract of the principal."). Entering a payment plan was, therefore, permissible under the terms of the relevant agreements and did not alter Western Surety's obligation under the Bond.[11]

      Western Surety argues, however, that it has suffered loss due to the extensions of time because, had it received notice of United's financial difficulties as soon as they arose, it could have canceled the Bond or asserted its rights under the Indemnity Agreement to take possession of United's machinery, equipment, tools, and materials, or obtain the proceeds under any other bonded contracts to which United was a party. *See* ECF No. 30-3 at 21. In support of this argument, Western Surety relies on an affidavit of Stephen Beatty, a Senior Claims Counsel employed by CNA Surety Company, Western Surety's parent corporation. ECF No. 30. Beatty attests that Plaintiffs' failure to provide notice sooner "hindered Western Surety's ability to exercise its rights as surety" because, by the time it received notice, United had already gone out of business. *Id.* at 2. Under the Indemnity Agreement, however, Western Surety had the right to examine United's books and records at any time, and it could have registered the agreement as a security interest if it concluded that it may become liable under the Bond. *See Forrester v. State, to Use of Kernan*, 46 Md. 154, 160–61 (1877) ("It was the duty of his sureties to make inquiries, and see to it that their principal discharged the obligation resting upon him, whether he was then solvent or insolvent."). Nothing in the Bond shifts this responsibility to Plaintiffs. Western Surety has the burden to prove its loss, *New Amsterdam Cas. Co.*, 16 F.2d at 852, but Beatty's

---

[11] Western Surety points to a provision of the CBA that mandates that the "business manager withdraw members from [United's] employment when [United] becomes sixty (60) days delinquent past the twentieth (20th) of the month in which the funds were due." ECF No. 30-2 at 39. Western Surety contends that, had the Union withdrawn its employees pursuant to this provision, United would not have been able to fall further behind in payments, and thus, Western Surety's risk was increased. ECF No. 31 at 38. When Plaintiffs and United entered the payment plan, however, United had not yet become sixty days delinquent past the due date for the contributions owed. *See* ECF No. 30-2 at 39, 262.

declaration that Western Surety was somehow hindered in exercising its rights is no more than a

"scintilla" of evidence, insufficient to satisfy Western Surety's burden in opposing Plaintiffs'

Motion, *see Anderson*, 477 U.S. at 252.

### D. Damages

Finally, Western Surety contends that Plaintiffs have failed to satisfy their burden of

proof as to the amount of damages owed under the Bond. With respect to this issue, Western

Surety lodges two arguments. First, Western Surety argues that Plaintiffs have failed to prove

damages because the remittance reports submitted in support of Plaintiffs' Motion constitute

inadmissible hearsay.[12] ECF No. 31 at 18–23. Second, Western Surety argues that even if the

remittance reports are admissible, Plaintiffs have failed to meet their burden of proof as to certain

projects on which Union members purportedly worked between January and March 2014. *Id.* at

23–29. Of these arguments, the Court is only persuaded by the latter.

It is true, of course, that "[t]o be entitled to consideration on summary judgment, the

evidence supporting the facts set forth by the parties must be such as would be admissible in

evidence." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 535 (D. Md. 2007). However,

"[u]nder the amended [Rule] 56, 'facts in support of or opposition to a motion for summary

judgment need not *be* in admissible form; the new requirement is that the party identifies facts

that *could be* put in admissible form.'" *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F.

Supp. 3d 398, 407 (D. Md. 2015) (emphases in original) (quoting *Wake v. Nat'l R.R. Passenger,

Corp.*, No. 12–1510, 2013 WL 5423978, at *1 (D. Md. Sept. 26, 2013)); *see also Niagara

Transformer Corp. v. Baldwin Techs., Inc.*, No. CIV.A. DKC 11-3415, 2013 WL 2919705, at *1

---

[12] Western Surety also argues that certain emails from a former United employee are inadmissible to prove the amount of damages owed. ECF No. 31 at 22. Because Plainitffs have failed to respond to Western Surety's argument in this regard, they have conceded this issue. *See McKeel v. United States*, 178 F. Supp. 2d 493, 504 (D. Md. 2001) (noting that a party conceded an argument by failing to respond to it).

n.1 (D. Md. June 12, 2013) ("Importantly, 'the objection [now] contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be.'" (citation omitted)).

To be deemed hearsay, a statement must be offered "in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). When properly placed in context, it is evident that the reports Plaintiffs rely on to prove their damages are not offered to prove that Union members in fact worked the hours documented on the remittance reports. Rather, the reports are offered to prove that United *reported* to Plaintiffs the hours worked and the contributions owed. While this may, at first blush, sound like a distinction without a difference, the CBA was clear that Plaintiffs were entitled to rely on United's self-reporting of the hours worked by Union members and the corresponding contributions that it would owe each month. *See* ECF No. 30-2 at 23, 39. Although the Benefit Funds could periodically audit United to ensure that the correct number of hours was being reported, United was required to track and report the hours worked by Union members. *See id.* Thus, the Benefit Funds must "rely on the employers who subscribe to their plans to submit honest and accurate information." *Bd. of Trustees v. D'Elia Erectors, Inc.*, 17 F. Supp. 2d 511, 517 (E.D. Va. 1998); *see also Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342–43 (D.C. Cir. 1991) ("[T]he Trustees remain dependent upon the operators' honesty and accuracy: the records with which the Trustees might verify the accuracy of the operators' reporting—as well as the accuracy of their contributions— both originate and stay with the operators."). Indeed, as the court in *D'Elia Erectors* recognized:

> [T]his reliance on the honesty and accuracy of the reporting employers is the heart that animates the self-reporting system. Even D'Elia admits that only with an employer's honest and accurate completion of the reports can the Funds be expected to calculate how much an employer owes in monthly contributions. To abandon this system and instead require employee-benefit funds to verify every piece of datum received from every employer would impose on funds burdens so

severe as to frustrate the efficiency goals of a self-reporting system. Indeed, it would be administratively impossible for [a fund] to review each and every contribution it receives from an employer for verification of the facts represented in the report. Thus, funds are entitled to rely exclusively on the information that they require employers to report.

*Id.* (internal quotation marks and citations omitted); *see also Nat'l Elec. Ben. Fund v. Arlington Park Racecourse, LLC*, No. 8:11-CV-0090-RWT, 2011 WL 2712742, at *4 (D. Md. July 8, 2011) (noting that "it is typical for multi-employer [benefit] funds . . . to require employers to 'self-report' the employment of covered employees and make contributions on their behalf" and that funds must rely on honesty and accuracy of the employers' reporting); *cf. U.S. for Use & Benefit of Westinghouse Elec. Supply Co. v. Endebrock-White Co.*, 275 F.2d 57, 60 (4th Cir. 1960) (holding, in action against surety company arising under the Miller Act, that "it is not required of the materialman that he prove that his materials were actually used in the prosecution of the work . . . , but only that in good faith he reasonably believed that the materials were so intended").[13] Thus, in order to establish that Plaintiffs are entitled to recovery under the Bond, they need not demonstrate that United employees in fact worked certain hours for which United was required to pay contributions. Rather, they need only show that United *reported* that Union members worked those hours and that Plaintiffs were entitled to those corresponding contributions, and, of course, that United failed to remit those payments. The remittance reports therefore are not hearsay and the Court may properly rely on them when ruling on Plaintiffs' Motion for Summary Judgment.[14]

---

[13] The Miller Act, 40 U.S.C. § 3131 *et seq.*, requires contractors on certain federal public works projects to, among other things, obtain payment bonds to protect persons supplying labor and material in carrying out the work involved in the project. *See* 40 U.S.C. § 3131(b)(2).

[14] Even if the reports were hearsay, however, they would be admissible under the business record exception. Contrary to Western Surety's contentions, "[t]he custodian [of records] need not have personal knowledge of the actual creation of the document to lay a proper foundation . . . ." *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000). Moreover, multiple courts have concluded that "a company receiving a document from another business can lay a sufficient foundation where it, acting in the regular course of its business, integrates the received record into its

24

Nevertheless, despite their admissibility, the Court agrees with Western Surety that the remittance reports submitted in support of Plaintiffs' Motion are insufficient to establish the precise amount of damages owed. The evidence indicates that, between January and March 2014, United was engaged in over a dozen construction projects, ECF No. 30-2 at 519, and Plaintiffs indicate that they have fully recovered the contributions owed on three projects. ECF No. 30-1 at 9–10; *see also* ECF No. 30-2 at 7–8. The remittance reports Plaintiffs rely on to prove their damages, however, largely do not break down the contribution calculations by project, but rather indicate the total number of hours Union members worked in a given month. See ECF No. 30-2 at 271–342, 347–410, 415–443. Plaintiffs submitted project-specific documentation for only five construction projects that they indicate amassed compensable hours during the relevant time period. *See* ECF No. 30-2 at 503–09, 540–66. Importantly, the CBA is limited in geographic scope; it applies in the District of Columbia; Maryland; Virginia, with the exception of eight of its counties; and only seven counties in West Virginia.[15] ECF No. 30-2 at 15. Absent project-

---

own business records, relies on it in its day to day operations and surrounding circumstances indicate trustworthiness." *Bank of New York Mellon v. Adams*, No. 5:13-CV-245-BO, 2014 WL 3810631, at *1 (E.D.N.C. Aug. 1, 2014); *see also, e.g., United States v. Powers*, 578 F. App'x 763, 779 (10th Cir. 2014) ("[T]he courts of appeals have overwhelmingly chosen to recognize—either explicitly or implicitly—an adoptive business records doctrine."). Although none of the affidavits submitted in support of Plaintiffs' motion explicitly state that the remittance reports were "adopted" by the Union and Benefit Funds when they were submitted by United each month, the evidence indicates that the reports submitted in support of the Motion are those that United submitted to Plaintiffs each month, and that Plaintiffs relied on the same in determining the amount of contributions United owed. *See* ECF No. 30-2 at 6, 269.

[15] Because it is likely to be raised at trial, the Court notes that, although Western Surety challenges Plaintiffs' right to recover contributions for work completed within the jurisdictional scope of the CBA, but outside of the jurisdictional scope of the Addendum to the CBA, *see* ECF No. 31 at 27–29 and footnote 3 of this Memorandum Opinion, the CBA itself provides that the minimum rate of wages for all Union members for work within the jurisdiction of the CBA is to be prescribed by the rates set forth in the Addendum. ECF No. 30-2 at 17. The Addendum further provides that, when Union members are sent to work in an area outside of the geographic scope of the Addendum, they must be paid the "highest total wage package" provided for in the CBA or Addendum, and that the "total wage package" includes "the value of all hourly contractual costs," which would include the relevant fringe benefits. ECF No. 30-2 at 40. Thus, read together, the CBA and the Addendum appear to contemplate work being performed outside the scope of the Addendum but within the scope of the CBA, and anticipates payment for such work. But even if the language of the CBA was ambiguous in this regard, Plaintiffs have submitted extrinsic evidence indicating that Plaintiffs and United intended contributions to be made for such work, namely, the remittance reports submitted by United, which includes a construction project that falls outside of the Addendum.

specific data for the jobs worked during the relevant time period, the Court has no method of determining whether Plaintiffs have satisfied their burden to demonstrate that the hours worked are compensable under the CBA, or that the contributions sought have not already been collected through other means.[16]

Thus, the Court is unable to conclude that there is no genuine dispute as to the amount of damages to which Plaintiffs may be entitled. In this regard, Plaintiffs' Motion for Summary Judgment is denied.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion is **GRANTED**, in part, and **DENIED**, in part. Specifically, Plaintiffs' Motion is granted with respect to Western Surety's liability under the Bond, but it is denied with respect to the amount of damages owed. A separate Order follows.

Dated: May  17 , 2016

GEORGE J. HAZEL
United States District Judge

---

See ECF No. 30-2 at 553–59. Western Surety has submitted no evidence to the contrary. *See Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 489 (Md. 1985) ("If the extrinsic evidence presents disputed factual issues, construction of the ambiguous contract is for the jury. The court may construe an ambiguous contract if there is no factual dispute in the evidence.").

[16] *Cf. Reliable Home Health Care, Inc. v. Union Cen. Ins. Co.*, No. CIVA98-2157, 2000 WL 1877119, at *4 (E.D. La. Dec. 27, 2000), *rev'd in part on other grounds*, 295 F.3d 505 (5th Cir. 2002) (reducing recovery to plaintiff in ERISA action where plaintiff settled with one defendant before trial in order to prevent double recovery because "ERISA contemplates equitable recoveries and not monetary gains").